[Civ. No. 7757. Third Dist. June 7, 1950.]

COEN V. SEXTON, Respondent, v. C. A. SIMONDET et al., Appellants.

Huberty & Huberty for Appellants.

Mull & Pierce and Mazzera, Snyder & DeMartini for Respondent.

VAN DYKE, J.—This is an appeal from an order of the trial court denying a motion for a change of place of trial. The action was begun in Sacramento County; the defendants, residents of Calaveras, moved for a change of place of trial to that county.

The complaint contains two counts. The first thereof contains allegations that may be summarized as follows: Plaintiff is a licensed real estate and business opportunity broker. On October 10, 1947, defendants, who are husband and wife, entered into a written contract with plaintiff whereby they employed him, as their agent, to find a purchaser for real and personal property in Calaveras County for a price of fifty thousand dollars ($50,000), payable on terms. By the agreement defendants agreed to pay plaintiff a commission of five thousand dollars ($5,000). The contract was made in Sacramento County and, by express provision, was to be performed there. Plaintiff fully performed by finding a purchaser, one Gebhardt, ready, able and willing to buy upon the contract terms. Gebhardt entered into a written agreement of purchase and sale with defendants. Defendants breached their contract with plaintiff in that they refused to pay the stipulated commission: The pleader does not make the written instrument a part of his pleading. He alleges what he claims to be the substance thereof.

Looking at this count, and confining our observation now to the face of the pleading as summarized, without reference to the actual written contract, which we will discuss later, we find this count to be a statement of a cause of action arising upon contract; that the contract was entered into and, by express stipulation, was to be performed in Sacramento County; that Sacramento County, therefore, is a proper place for the trial. (Code Civ. Proc., § 395, subd. 1; *Armstrong* v. *Smith*, 49 Cal.App.2d 528 [122 P.2d 115].)

But appellants make the following contentions: They say but one written contract, dated October 10, 1947, was entered into, that plaintiff has not truly stated its substance, and has not in fact sued upon it. A copy of the instrument itself is annexed to the affidavit. We shall refer to this, for convenience, as the brokerage contract. They say a second document, copy of which is likewise annexed as an exhibit,

was executed. This document is dated November 5, 1947, and we shall call it, for convenience, the second document. They say this second document is an independent contract, separate from the brokerage contract, and is the contract which plaintiff sues upon. And they conclude that since this second document was signed by defendants in Calaveras County, the county of their residence, and neither therein nor at all have defendants specially contracted that their obligations thereunder were to be performed in any other county, Calaveras County is the only proper county for the trial of the issues actually tendered by the first count of plaintiff's complaint. (Code Civ. Proc., § 395, subd. 1; *Armstrong* v. *Smith, supra.*) This legal conclusion is correct if the above stated premises upon which it is grounded have been established. The real issue then is, what contract is the first count based on? A detailed statement as to the contents of the documents involved is necessary.

The brokerage contract, dated October 10, 1947, is entitled "Uniform Authorization to Sell." C. A. Simondet signed it; his wife, the other party defendant, did not. He is designated the "seller" and plaintiff the "agent." The seller employed the agent to sell, and empowered him to bind the seller to convey, the described property. (The complaint describes the same property except that one item ["Accounts receivable (approx. 6500.00)"] listed in the brokerage contract is omitted from the complaint.) The seller fixed the price at *sixty thousand dollars net to the seller.* The terms were: minimum cash down, forty thousand dollars; balance, note and deed of trust. Possession was to be delivered one day after passing of deed and bill of sale. The contract then provided as follows:

" 'Seller' agrees that should a sale or exchange of said property be made upon said terms, or any terms, satisfactory to 'Seller' or otherwise during the life of this contract, by either party to this agreement, or by any other party, or after the termination of this agreement, if sold to a party to whose attention said property was brought by or through 'Agent' said 'Agent' shall receive out of the first payment on said property a commission of NETLISTING per cent of the price for which said property was sold. 'Seller' and 'Agent' mutually agree that this authorization to sell is EXCLUSIVE, and in the event the property described herein or any part thereof, be traded, exchanged, leased, or sold to anyone during the life of this agreement, whether by a party to this agreement or not,

the 'Agent' herein shall be entitled to the commission herein specified for any trade, exchange, lease, or sale. Said commission shall be paid at the office of 'Agent' in the City of Sacramento, the place where this contract is to be performed."

The following observations are pertinent here, as will be seen: Had the contract ended with the provisions thereof ahead of the language quoted above, it would plainly have been a so-called "net listing" contract or "broker's net contract," one whereby the seller does not agree to pay the agent any commission at all in a proper sense, but compels him to sell the property at a price in advance of the net price, or to get his compensation from the buyer. Under such a contract the agent could never successfully sue the seller for compensation. *Ford* v. *Brown,* 120 Cal. 551, 552 [52 P. 817], where the Supreme Court, referring to a net price contract, said that under such a contract the "brokers were employed . . . to sell land at any price, so they gave her $14,800 net. She did not agree to pay them anything for their services. On the contrary, the brokers were in effect told that she would not pay them, but they must get their pay from the purchaser." To the same effect see, also, *Haigler* v. *Donnelly,* 18 Cal.2d 674, 678 [117 P.2d 331], and *Palmtag* v. *Danielson,* 30 Cal.2d 517 [183 P.2d 265].

But the contract did contain the quoted provision and thereby the exact nature of the contract became uncertain. It is contended by respondent, plaintiff below, that these provisions show the contract to have been not one of the special type above discussed, but a general brokerage contract which mentioned a price merely as an asking price, and, as the court said in *Palmtag* v. *Danielson, supra,* simply for the guidance of the broker in his negotiations with prospective purchasers.

Without further discussion of the brokerage contract at this time, we will turn to the second document. It is entitled "Deposit Receipt." It is signed by plaintiff through his salesman Wheeler, and acknowledges receipt from Gebhardt of a check for four thousand dollars on account of the purchase price of described property. This description coincides exactly with that used in the complaint. It expressly excludes accounts receivable. The purchase price named is fifty thousand dollars, not sixty thousand. Twenty-one thousand dollars is payable as further deposit "as soon as this offer is accepted." Balance at start of escrow. The title is not to pass before January 2d following. The seller is to aid in running the

business for one month thereafter, without charge. The document states: "This is an offer," and that its terms are subject to the seller's approval. At this point the agent signed, and just below Gebhardt agreed, over his signature, to buy on the terms expressed. Following that, defendants both signed, declaring themselves bound to sell, and expressly agreed to pay plaintiff, as commission, the sum of five thousand dollars, the exact sum for which plaintiff sues. Nowhere is the brokerage contract referred to, and the document expresses a complete offer to buy, acceptance thereof, and hence a contract complete within its own terms, with an express agreement to pay the plaintiff's commission.

For the purpose of the motion the trial court had to look to the complaint, the affidavit in support of the motion, and the counteraffidavit of the salesman Wheeler. It stands undisputed that but one contract was executed on October 10, 1947—that set forth in *haec verba* in the movant's affidavit. Comparing that document with the first count, which purports to plead its substance, we find the following: "It is alleged that plaintiff and defendants entered into a written contract on October 10, 1947. True, except that one defendant was not a party to it. It is alleged that certain property was the subject of this contract. True, but the actual contract included in the property to be sold the very substantial item of accounts receivable. For a price, says the pleader, of fifty thousand dollars. Untrue, since the real contract fixed a price ten thousand dollars higher. Under the contract terms, says the pleader, the defendants agreed to pay five thousand dollars commission. Not at all. The true contract fixed no amount of commission, and only one defendant was a party signatory thereto. Plaintiff performed, says the pleader, in this: that on November 5, 1947 (the date of the second document), and while the brokerage contract was in force, Gebhardt was obtained as a purchaser "upon the terms and conditions aforesaid." True, as those terms were pleaded, untrue if we consider the terms of the real contract. Gebhardt, says the pleader, on that date entered into a written agreement of purchase and sale. True, but that agreement was indisputably the second document, wherein alone do we find both defendants bound to pay plaintiff the exact commission for which he sues.

Considering now the second document, and comparing its contents with the pleading, we find that its provisions alone exactly match the pleading of the contractual obligations, and

the allegations as to parties. Thus it was the only document signed by both defendants, the only one the property description in which matches the pleading; the only one which matches the pleaded price; the only one which does contain the undertaking pleaded to pay the commission sued for. But it significantly does not contain the stipulations depended on to hold the venue in Sacramento County.

Respondent contends the two instruments must be construed together, that the second document was merely evidence of a step taken in performance of the first. He points particularly to the portions of the brokerage contract quoted above and says in effect these provisions take the contract out of the net listing class and make it a general contract of brokerage. But a consideration of these provisions develops the error in this contention. They do declare, and in language generally applicable to general brokerage contracts, that if a sale is made on any terms satisfactory to the seller the agent shall receive a commission of "NETLISTING" per cent of the price. But the very insertion of the term net listing in the blank left to state the rate of commission makes it obvious the parties were studiously staying within the undertaking declared in the first part of the instrument and that they inserted the word "netlisting" to harmonize therewith. Otherwise the sentence means little. There is no such thing as a netlisting per cent. Clearly the plain antecedent provisions of the contract must control.

We are not forgetting that the affidavit of the salesman Wheeler contains an attempt to explain this sentence. He avers that during the talk in plaintiff's place of business leading up to the signing of the brokerage contract, he told defendant C. A. Simondet that the commission for selling a business was 10 per cent of the price; that for said defendant to get sixty thousand dollars the property must be sold for enough more to pay the commission; that if a reasonable offer were received he would not refuse it, but would report it to determine if it was acceptable to Simondet. That said defendant agreed to all of this and then, says the affiant, the brokerage contract was prepared, read by Simondet and signed by him.

Obviously, under such circumstances, these oral matters became no part of the written contract. They are contradictory therewith. They were omitted from the written instrument. The only function of such evidence of antecedent oral negotiations was to explain, if it would explain, the doubtful

sentence now being considered. But it does not explain. It certainly does not explain why the term "netlisting" was inserted. That term was completely inconsistent with the alleged oral understanding. Affiant Wheeler does go on to say that on November 5th Gebhardt "made an offer to purchase the said business at and for the sum of Fifty Thousand Dollars ($50,000.00) and the said defendant accepted said offer and renewed his promise to pay a commission to plaintiff, all as set forth in the deposit receipt. . . ." It must be held there had been no such promise which could be "renewed," and that the deposit receipt embodied that promise for the first time. For the purposes of this motion we hold the first count in the complaint to be based upon the deposit receipt, wherein only is there found an agreement to pay the sum for which respondent sues, and therefore that appellants were entitled to have that cause tried in the county of their residence.

Turning now to the second count, the parties advance various contentions as to the nature thereof. But if we are right in what we have heretofore said, then it becomes unnecessary to go further, because whether that count sounds in tort, as contended by appellants, or in contract, as contended by respondent, it is joined with a cause triable, on proper demand, only in the county of appellants' residence. Hence, when respondent elected to join this count with one so triable, both must be moved. As authority for this statement we quote the following from *Goossen* v. *Clifton*, 75 Cal.App.2d 44, 49 [170 P.2d 104]:

"The rule is fundamental. The important right to protect is that of the defendant to have the cause tried in the county of his residence. For the plaintiff to be entitled to the exceptional right of having the cause tried in some other county, he must clearly bring himself within a statutory exception. If, by joining several causes of action, the defendant could be deprived of his right, the right would be lost in many cases. It is for that reason that the courts hold that the test is whether on any one of the causes of action the defendant is entitled to a change to the county of his residence. If there is one such cause, then defendant is entitled to the change no matter how many other causes may be set forth in which he is not entitled to the change. That is the situation here presented."

As said in *Armstrong* v. *Smith*, *supra*, "Sight must not be lost of the fact that on this appeal we are dealing solely with

a question of venue. The enforceability of the contract is not in question, nor are any of the issues tendered by the complaint.''

The judgment is reversed.

Adams, P. J., and Peek, J., concurred.

A petition for a rehearing was denied July 6, 1950, and respondent's petition for a hearing by the Supreme Court was denied August 3, 1950.